**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LAWRENCE PHILLIPS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PANERA BREAD COMPANY, RONALD M. SHAICH, WILLIAM W. MORETON, DOMENIC COLASACCO, DIANE HESSAN, FRED FOULKES, LARRY FRANKLIN, THOMAS E. LYNCH, MARK STOEVER, and JAMES WHITE<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Lawrence Phillips ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Panera Bread Company, ("Panera" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Panera, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100 in connection with the proposed merger (the "Proposed Merger") between Panera and JAB Holdings B.V. ("JAB").

2.     On April 4, 2017, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive $315.00 in cash for each share of Panera stock they own (the "Merger Consideration").

3.     On June 1, 2017, in order to convince Panera shareholders to vote in favor of the Proposed Merger, the Board authorized the filing of a materially incomplete and misleading Definitive Proxy Statement on a Schedule 14A (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.     While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading.

5.     In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for the Company; and (ii) the valuation analysis performed by the Company's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley"), in support of its fairness opinion.

6.     The special meeting of Panera shareholders to vote on the Proposed Merger is scheduled for July 11, 2017. It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote, so that they can properly exercise their corporate suffrage rights.

7.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 and Regulation G, 17 C.F.R. § 244.100. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed

Merger unless and until the material information discussed below is disclosed to Panera shareholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; and (ii) Panera is formed in this District.

## PARTIES

11. Plaintiff is, and at all relevant times has been, a Panera shareholder.

12. Defendant Panera is incorporated in Delaware and maintains its principal executive offices in at 3630 South Geyer Road, Suite 100, St. Louis, Missouri 63127-1234. The Company is a national bakery-cafe concept. As of December 27, 2016, the Company operated over 2,000 own and franchise-operated bakery-cafe locations in 46 states, the District of Columbia, and Canada.

13. Individual Defendant Ronald M. Shaich ("Shaich") is the founder, chairman and Chief Executive Officer of Panera.

14. Individual Defendant William W. Moreton ("Moreton") is the Executive Vice Chairman and has served as a director of Panera since May 2010.

15. Individual Defendant Domenic Colasacco ("Colasacco") has served as a director of Panera since March 2000.

16. Individual Defendant Diane Hessan ("Hessan") has served as a director of Panera since November 2012.

17. Individual Defendant Larry Franklin ("Franklin") has served as a director of Panera since June 2001.

18. Individual Defendant Thomas E. Lynch ("Lynch") has served as a director of Panera since March 2010.

19. Individual Defendant Mark Stoever ("Stoever") has served as a director of Panera since January 2016.

20. Individual Defendant James White ("White") has served as a director of Panera since January 2016.

## CLASS ACTION ALLEGATIONS

21. Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Panera (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

22. This action is properly maintainable as a class action because:

a. The Class is so numerous that joinder of all members is impracticable. As of May 22, 2017, there were approximately 21,335,348 shares of Class A Panera common stock outstanding, and 1,381,730 shares of Class B Panera common stock outstanding held by hundreds to thousands of individuals and entities scattered throughout the country.[1] The actual number of public shareholders of Panera will be ascertained through discovery;

b. There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

   i) whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

   ii) whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

   iii) whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

---

[1] At the special meeting on July 11, 2017, each holder of Class A common stock will be entitiled to cast one vote per such share; each holder of Class B common stock will be entitled to cast three votes per such share. Proxy at 2.

  c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

  d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

  e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

  f. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

  g. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I. The Proposed Transaction**

23. On April 5, 2017, Panera and JAB issued a press release announcing the Proposed Merger, which states in pertinent part:

> ST. LOUIS, April 5, 2017 – Panera Bread Company ("Panera" or the "Company") (NASDAQ: PNRA) and JAB today announced that the companies have entered into a definitive merger agreement under which JAB will acquire Panera for $315 per share in cash, in a transaction valued at approximately $7.5 billion, including the assumption of approximately $340 million of net debt. The agreement, which has been unanimously approved by Panera's Board of Directors, represents a premium of approximately 30% to the 30-day volume-weighted average stock price as of March 31, 2017, the last trading day prior to news reports speculating about a potential transaction, and a premium of

6

...

approximately 20% to Panera's all-time high closing stock price as of that same date.

Ron Shaich, Founder, Chairman and CEO of Panera, commented, "By any measure, Panera has been one of the most successful restaurant companies in history. What started as one 400 square foot cookie store in Boston has grown to a system with over 2,000 units, approximately $5 billion in sales, and over 100,000 associates. In more than 25 years as a publicly traded company, Panera has created significant shareholder value. Indeed, Panera has been the best performing restaurant stock of the past twenty years – up over 8,000%. Today's transaction is a direct reflection of those efforts, and delivers substantial additional value for our shareholders."

Shaich continued, "Over the last five years, we have developed and executed a powerful strategic plan to be a better competitive alternative with emerging runways for growth. The themes we have bet on - digital, wellness, loyalty, omni-channel, new formats for growth - are shaping the restaurant industry today. Indeed, the power of the plan is evident in our business results. Today, we are pre-releasing Q1 2017 Company-owned bakery-cafe comps of 5.3%, which is 690 bps better than the Black Box all-industry composite."

Shaich concluded, "Our success for shareholders is the byproduct of our commitment to long-term decision making and operating in the interest of all stakeholders, including guests, associates, and franchisees. We believe this transaction with JAB offers the best way to continue to operate with this approach. We are pleased to join with JAB, a private investor with an equally long-term perspective, as well as a deep commitment to our strategic plan."

Olivier Goudet, JAB Partner and CEO, said, "We have long admired Ron and the incredible success story he has created at Panera. I have great respect for the strong business that he, together with his management team, its franchisees and its associates, has built. We strongly support Panera's vision for the future, strategic initiatives, culture of innovation, and balanced company versus franchise store mix. We are excited to invest in and work together with the Company's management team and franchisees to continue to lead the industry."

The transaction is not subject to a financing condition and is expected to close during the third quarter of 2017, subject to the approval of Panera shareholders and the satisfaction of customary closing conditions, including applicable regulatory approvals.

Mr. Shaich has entered into a voting agreement whereby he and entities affiliated with him have agreed to vote shares representing approximately 15.5% of the Company's voting power in favor of the transaction. Following the close of the transaction, Panera will be privately held and continue to be operated independently by the Company's management team.

JAB is acquiring Panera through JAB BV, an investment vehicle of JAB Consumer Fund and JAB Holding Company. JAB Consumer Fund is backed by a group of like-minded, long-term oriented investors and, together with JAB Holding Company, invests in companies with premium brands, attractive growth and strong margin dynamics in the Consumer Goods category. Both JAB Holding Company and JAB Consumer Fund are overseen by three senior partners, Peter Harf, Bart Becht and Olivier Goudet. Entities affiliated with BDT Capital Partners are also investing alongside JAB BV.

## II. The Merger Consideration Appears Inadequate in Light of Panera's Recent Financial Performance and Growth Prospects

24. Panera is a national bakery-cafe concept. As of December 27, 2016, the Company operated over 2,000 own and franchise-operated bakery-cafe locations in 46 states, the District of Columbia, and Canada. The Company operates through three segments: (i) company bakery-cafe operations, (ii) franchise operations, and (iii) fresh dough and other product operations. The Company operates under the "Panera Bread," "Saint Louis Bread Co." and "Paradise Bakery & Café" brands.

25. The Merger Consideration appears inadequate in light of the Company's recent financial performance and prospects for future growth. Indeed, at the fiscal year end of 2016, the Company reported GAAP-diluted earnings per share of $6.18, up seven percent from the previous fiscal year.

26. In a February 7, 2017 press release, Individual Defendant Shaich extolled the Company's year-end results, noting that Panera was well-positioned to thrive in the future:

> The power of our multi-year strategic plan and the impact of our initiatives to transform Panera into a better competitive alternative with expanded runways for growth becomes ever-more clear with each passing quarter. In 2016, company comparable-store sales rose 4.2%, and our two-year comps were up 7.2%. What's more, we again took market share in 2016 as our company comps outperformed the Black Box all-industry composite by 530 basis points. As well, we notched a new record for new cafe average weekly sales as sales reached $49,745 in new company cafes. Most importantly, our year-over-year growth in non-GAAP EPS was up 9% in 2016, which is further evidence that we have reached an inflection

point in our transformation.

With peak investments and significant scale behind us, we are now focused on completing the rollout of our initiatives and reaping the benefits. Because of the strength of our initiatives, we are confident our efforts will translate into market share gains and sustainable double-digit earnings growth.

27. Success continued into the first fiscal quarter of 2017. Company-owned comparable net bakery-cafe sales increased 5.3 percent compared to the same period in the previous fiscal year; and two-year company-owned comparable net bakery-cafe sales increased 11.5 percent. Additionally, Company-owned comparable net bakery-cafe sales in the first fiscal quarter of 2017 outperformed industry composites by 6.9 percent.

28. In sum, it appears that Panera is well-positioned for financial growth, and that the Merger Consideration fails to adequately compensate the Company's shareholders. It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Merger.

### III.   The Materially Incomplete and Misleading Proxy

29. On June 1, 2017, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger. The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

30. First, the Proxy fails to provide material information concerning the Company's financial projections. Specifically, the Proxy provides non-GAAP (generally accepted accounting principles) "EBITDA," "EBIT," "Unlevered Cash Flow from Operations," "Unlevered Free Cash Flow," and "Capital Expenditures and Other Investing Cash Flow" but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures.

31. When a company discloses non-GAAP financial measures in a Proxy, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

32. Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders. The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Panera included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-

GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[2]

33. Last year, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[3] Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[4] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

34. In order to make the projections for Panera included on page 47 of the Proxy materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

35. At the very least, the Company must disclose the line item projections for the financial metrics that were used to calculated the above-mentioned non-GAAP measures. Such projections are necessary to make the non-GAAP projections included in the Proxy not

---

[2] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

[3] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[4] *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

misleading. Indeed, the Defendants acknowledge that disclosing non-GAAP projections may mislead shareholders in the Proxy, as Panera stockholders are cautioned "not to place unwarranted reliance on our forward looking statements" Proxy, 20.

36. The Proxy wholly omits Panera's definitions of "EBITDA," "EBIT" and "Capital Expenditures and Other Investing Cash Flow." Such projections were specifically based on each company's forecasts and were relied upon by the bankers in connection with their valuation analysis. Proxy, 37. The opacity concerning the Company's internal projections renders the information set forth on page 47 of the Proxy materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently. Once a proxy discloses internal projections relied upon by the board, they must be complete and accurate.

37. The Proxy also omits certain key inputs necessary for shareholders to assess the valuation analysis performed by Morgan Stanley in support of their fairness opinion, rendering the summary of such analysis in the Proxy incomplete and misleading.

38. With respect to Morgan Stanley's Discounted Cash Flow Analysis, the Proxy fails to disclose: (i) the line items used to calculate unlevered free cash flow, including the tax-affected earnings before interest and taxes and after stock-based compensation expense, depreciation and amortization, capital expenditures, cash flow from other investing activities, working capital, and after tax one-time items of the Company as provided by Panera's management; (ii) the estimated debt outstanding (inclusive of capital leases), and estimated non-controlling interest and cash, cash equivalents and marketable securities as of December 31, 2016, as provided by the Panera's management; and (iii) the total number of fully diluted shares of Panera common stock outstanding as of December 31, 2016, as provided by Panera's management.

39.     These key inputs are material to Panera shareholders, and their omission renders the summary of Morgan Stanley's Discounted Cash Flow Analysis, on page 43 of the Proxy, incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion <u>unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices</u>. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

40.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I
### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)

41. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

42. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

43. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

44. SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement. The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading.*" 17 C.F.R. § 244.100(b). The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly

comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a). As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

45. The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

46. Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company; and (ii) the valuation analysis performed by Morgan Stanley in support of its fairness opinion.

47. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

48. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed

Merger; indeed, the Proxy states that Morgan Stanley reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Morgan Stanley as well as its fairness opinion and the assumptions made and matters considered in connection therewith.

49. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review Morgan Stanley's analyses in connection with their receipt of the fairness opinion, question Morgan Stanley as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

50. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

51. Panera is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

52. The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations

16

and omissions are not corrected prior to the vote on the Proposed Merger.

53. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

### COUNT II
**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

54. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

55. The Individual Defendants acted as controlling persons of Panera within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Panera, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

56. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

57. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act

violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were thus directly involved in preparing this document.

58. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

59. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

60. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

61. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B. Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C. Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 7, 2017

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
James M. Wilson, Jr.
685 Third Ave., 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Email: nfaruqi@faruqilaw.com
Email: jwilson@faruqilaw.com

*Counsel for Plaintiff*

**FARUQI & FARUQI, LLP**

By: */s/ Michael Van Gorder*
Michael Van Gorder (#6214)
20 Montchanin Road, Suite 145
Wilmington, DE 19807
Tel.: (302) 482-3182
Email: mvangorder@faruqilaw.com

*Counsel for Plaintiff*